UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES D. GREEN,

    Plaintiff,

  v.           Case No. 23-cv-0136-bhl

ROBERT WEINMAN, et al.,

    Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff James D. Green, an inmate at Waupun Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims in connection with Defendants' alleged deliberate indifference to his complaints of kidney and chest pain and shortness of breath. On February 9, 2024, Defendants moved for summary judgment. For the reasons explained below, the Court will grant Defendants' motion and dismiss the case.

## BACKGROUND

At the relevant time, Green was incarcerated at Waupun Correctional Institution, where Defendant Jodi Fields worked one day per week as an advanced practice nurse prescriber (APNP), Defendant Brian Taplin worked as a nurse, and Defendant Robert Weinman worked as the health services unit manager. On July 1, 2022, APNP Diana Simmons (not a Defendant) saw Green to discuss potential pain relief for complaints of chronic pain in the lower palm and inner wrist of his right hand. She prescribed Topiramate, which is an antiepileptic drug that is often used off-label to treat nerve pain. APNP Simmons also submitted an order for Green to undergo an assortment of diagnostic testing. Dkt. No. 34 at ¶¶1-8, 16, 24-27, 89.

On August 25, 2022, Green underwent diagnostic testing and a urinalysis. The results of the urinalysis were normal except for trace levels of ketones. Defendants explain that ketones are a chemical byproduct of the body breaking down fat because there is not enough insulin in the system to turn glucose into energy. Having some ketones in the urine is normal, but high levels of ketones could result in serious illness. Green had only trace levels, not high levels of ketones. Defendants further explain that there could be numerous reasons that Green had trace levels of ketones in his urine, including stress, not drinking enough water, not eating enough carbohydrates, and overexercising. Fields asserts that the trace levels of ketones in Green's urine were not a cause of concern to her. Dkt. No. 34 at ¶¶28-38.

The lab results were also largely within normal ranges. Defendants explain that Green had slightly elevated levels of the enzyme aspartate aminotransferase and of bilirubin, but, according to APNP Fields, the levels did not raise red flags or indicate any severe condition that would have been linked to kidney pain, chest pain, cough, or shortness of breath. On August 26, 2022, APNP Simmons sent a letter to Green, stating, "We want to let you know about your laboratory results. Some of these results are outside the range of normal, and we would like to discuss them further with you. Please keep your upcoming scheduled [] appointment to do so." APNP Fields did not know APNP Simmons was going to send an "abnormal results letter," and she explains that she would not have done so because none of Green's results were concerning. Dkt. No. 34 at ¶¶28-38.

On September 13, 2022, Green submitted a health services request that was forwarded to APNP Fields in which he stated that the medication prescribed for his nerve pain was not working. He further stated that he had pain in his side and stomach. APNP Fields reviewed Green's medication records and noted that he had not been consistently taking the medication prescribed

2

for his nerve pain for several weeks. She planned to have Green see a nurse to discuss signing a refusal. She also noted that Green had a provider appointment scheduled in a few weeks. Dkt. No. 34 at ¶¶43-45.

A few weeks later, on October 4, 2022, another urinalysis was conducted at Green's request. No abnormal findings were found. A couple of days later, APNP Fields noticed that Green was scheduled to be seen by *her* a few days later, but because Green had been previously seen by APNP Simmons and because the follow-up appointment was to review the medication that APNP Simmons had prescribed, APNP Fields decided it would be more appropriate for Green to be seen by APNP Simmons for continuity of care. APNP Fields explains that she amended the follow-up order for Green to see APNP Simmons rather than her. She asserts that she assumed Green would see APNP Simmons around the same date he was scheduled to see her. Dkt. No. 34 at ¶¶46-50.

About a week later, on October 10, 2022, APNP Fields received a health services request from Green in which he complained that his knee was clicking, and he wanted another cortisone injection. APNP Fields advised him to discuss his concerns at the follow-up appointment with his provider, meaning APNP Simmons. On October 19, 2022, Fields received notice that Green's prescription for Topiramate was set to expire in two weeks. Although Green was not consistently taking the medication, she renewed it because she believed APNP Simmons should make the decision on whether to cancel it entirely. Because he was at the law library, Green did not attend nursing appointments on October 20 and 21, 2022, which had been scheduled to address his complaints of kidney pain, cough, and shortness of breath. Dkt. No. 34 at ¶¶51-58; Dkt. No. 42 at ¶57.

3

On October 25, 2022, Green was seen by Nurse Taplin in response to a health services request in which Green indicated he was having excruciating pain in his kidneys, losing his breath with a cough, and experiencing pain when laying down on his side. According to Green, Nurse Taplin asked him where he thought the pain was coming from and he told him he did not know but noted he had been taking pain medication for his nerve damage. Green asserts that Nurse Taplin told him to stop taking the medication to see if that stopped the pain. Green asserts that he questioned whether it was safe for him to stop taking the medication abruptly, but Nurse Taplin told him that it would be fine and noted that if he "start[ed] feeling like crap again" he could restart it. According to Green, he left the appointment in distress, hunched over in pain while taking short breaths. Dkt. Nos. 34, 42 at ¶¶58, 79-87.

Nurse Taplin remembers his interactions with Green differently. According to Nurse Taplin, Green was not in any apparent distress during their meeting. He asserts that Green's main complaint concerned side effects from the Topiramate. Taplin states that Green told him he had not taken the medication that morning because of the side effects. Taplin asserts that he suggested Green pause taking the medication for three days to see if they could rule out Topiramate as the cause of his symptoms. He instructed Green to notify the health services unit if his symptoms improved or remained the same during that three-day pause. Dkt. Nos. 34, 42 at ¶¶88-97.

Nurse Taplin explains that there can be complications from suddenly stopping Topiramate, but those complications are mainly related to the recurrence of seizures since Topiramate's intended use is as an anti-seizure medication. Accordingly, because Green was prescribed Topiramate for nerve pain and not for seizures, he was not concerned about Green pausing for three days to rule out Topiramate as the cause of his symptoms. In any event, Nurse Taplin explains that Green was not taking Topiramate consistently anyway. In fact, in August, Green's

4

blood levels came back undetectable for Topiramate and his medication administration records show that he was not consistently taking the medication between August and October. Dkt. Nos. 34, 42 at ¶¶88-97.

The same day he met with Nurse Taplin, Green submitted an interview request form to the health services manager in which he complained that Taplin had failed to properly examine him. He noted that Taplin did not take his vitals and only asked Green what he thought was causing the pain in his kidneys. Green further noted that Nurse Taplin had encouraged Green to stop taking his medication for three days to see if the pain and shortness of breath stopped. Two days later, on October 27, 2022, Green's health services request was sent to health services manager Ann York, who consulted with Nurse Taplin. In response, Green was reminded that he had told Nurse Taplin that he thought he might be experiencing side effects from the medication he had been taking for months. Green was also informed that Nurse Taplin was trying to rule out whether the medication was a possible cause of his symptoms. Green was advised (again) to let the health services unit know in three days if his symptoms continued or improved. Dkt. No. 35-1 at 49.

On October 29, 2022, Green submitted another health services request expressing that he was experiencing kidney pain, shortness of breath, chest pain, and numbness in his hands. The request was forwarded to APNP Fields, who ordered a urine test to check for signs of dehydration or blood in Green's urine. It is not clear why, but Green did not attend an appointment with a nurse on November 1, 2022. About a week later, he had a urinalysis, which again showed trace levels of ketones, "elevated specific gravity, which is a measurement of the urine's overall concentration," and an elevated level of protein in his urine. APNP Fields explains that there are a variety of reasons for the elevated results, including dehydration and sperm in his urine. She states that because the results were only slightly elevated and the urinalysis from a month earlier

5

was normal, she did not believe the results were clinically significant. Dkt. Nos. 34, 42 at ¶¶59-66; Dkt. No. 45 at ¶¶5-6.

On November 10, 2022, Green submitted a health services request stating he was experiencing pain in his hand, knee, and stomach. APNP Fields responded on November 14, 2022, letting Green know he was scheduled to be seen. At the time of the response, Green was scheduled to see APNP Simmons on November 28, 2022, but, for reasons unknown to APNP Fields, that appointment did not happen. On November 16, 2022, two days after APNP Fields had responded to the health services request, Green was seen by a nurse for complaints of chest pain. At that time, he also stated that his kidneys hurt. Green informed the nurse that he was drinking only enough water "to survive." Green explains that Waupun has informed inmates of issues with the water, so when he is in segregation, he limits the amount he drinks. The nurse educated Green on the importance of fluid intake. Otherwise, her assessment of Green was unremarkable. Dkt. Nos. 34, 42 at ¶¶67-70; Dkt. No. 45 at ¶7.

On December 8, 2022, Green was seen by APNP Simmons to discuss pain management for his neuropathy. By this time, APNP Fields was no longer seeing patients at Waupun. At the appointment, Green denied having a cough, chest pain, or abdominal pain. According to Green, his pain and cough had resolved after he took the nurse's advice and began drinking more water. Green initiated this lawsuit a few months later, on February 1, 2023. Dkt. Nos. 34, 42 at ¶¶71-72; Dkt. No 1.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might

6

Case 2:23-cv-00136-BHL   Filed 05/14/24   Page 6 of 14   Document 46

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

**1. No jury could reasonably conclude that APNP Fields was deliberately indifferent to Green's serious medical condition.**

To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). When assessing whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citations omitted). The Seventh Circuit has made clear that, to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.*

Green's complaints of severe kidney and chest pain along with a cough from September 2022 through the beginning of December 2022 are sufficient for a jury to conclude that he was

suffering from an objectively serious medical condition. However, no jury could reasonably conclude that APNP Fields was deliberately indifferent to that condition. Green's main complaint is that, despite slightly abnormal lab results, APNP Fields never evaluated him during that three-month period even though she was his assigned primary care provider. But APNP Fields explains that, due to staffing issues at Waupun, she could provide only limited coverage to Waupun inmates one day per week. Dkt. No. 35 at ¶13. And, while Green was technically assigned to her based on his inmate number, any provider could see him if necessary. Indeed, APNP Simmons had seen Green in April 2022 to develop a plan of care for his chronic pain and neuropathy. She saw him again in July 2022, at which time she prescribed Topiramate, which is an anti-seizure medication that is also prescribed to treat a variety of neuropathic pain conditions. APNP Simmons also sent Green a letter in August 2022 following lab results that were outside the normal range. But, in early October 2022, a follow-up urinalysis showed no abnormalities. Given APNP Simmons' involvement in Green's care and the fact that the most recent urinalysis results were normal, APNP Fields decided to transfer Green's care to APNP Simmons. Accordingly, she amended the follow-up order so Green would be seen by APNP Simmons rather than by her. To ensure continuity of his medication, she also renewed Green's prescription for Topiramate pending his appointment with APNP Simmons so that he could discuss his concerns with her, as she was the provider who originally prescribed the medication. *See* Dkt. No. 35 at ¶¶13-44. No jury could reasonably conclude that APNP Fields demonstrated deliberate indifference to Green's medical needs simply because she decided that, given the pre-existing relationship between APNP Simmons and Green, it would be better for APNP Simmons to continue treating Green.

Green points out that, as a result of this decision, he had to wait two additional months to see an advance care provider. But APNP Fields explains that, when she revised the follow-up

8

Case 2:23-cv-00136-BHL   Filed 05/14/24   Page 8 of 14   Document 46

order, she believed the scheduler would reschedule Green to see APNP Simmons around the same date he had been scheduled to see her. APNP Fields confirms that she has no control over when appointments are scheduled. With the benefit of hindsight, APNP Fields understands that her assumption about when Green's appointment would be rescheduled was incorrect, but, at that time, she did not know there would be a delay, and she cannot have been deliberately indifferent to a delay she was unaware would occur. Her failure to confirm when the appointment would be scheduled was at most negligence, which is not sufficient to support a constitutional violation. *See Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation.").

Green also provides no evidence from which a jury could reasonably conclude that he was harmed by the delay in seeing an advanced care provider.[1] Green highlights that the initial testing revealed that certain levels were slightly outside the normal range, and he speculates that these abnormalities were the cause of his severe kidney pain, chest pain, and cough. But he ignores that just before APNP Fields decided to transfer his follow-up appointment to APNP Simmons, Green's updated test results were all within normal ranges. Further, APNP Fields, whose opinion is based on her training as a medical professional, explains that the slight abnormalities in his initial testing did not indicate any sort of severe condition that would be linked to kidney pain, chest pain, cough, or shortness of breath. *See* Dkt. No. 35 at ¶¶28-29. Accordingly, there was no medically supported urgency in scheduling an evaluation. She notes that elevated levels and

---

[1] Green had two nursing appointments between the time APNP Fields transferred his follow-up appointment to APNP Simmons. His symptoms resolved after the second nursing appointment when he heeded the nurse's advice and began to drink more water. Green also missed three nursing appointments during that time (he was at the law library for two of them). Also, an appointment with APNP Simmons scheduled for the week before he finally saw her did not happen, but the parties do not explain why.

9

symptoms can be the result of a variety of circumstances, including dehydration. Indeed, Green acknowledges that, following a nurse reminding him of the importance of fluid intake, he began to drink more water and his kidney pain, chest pain, and cough resolved. Thus, the solution to Green's complaints was always within his control. Green's symptoms were not ultimately resolved by any medical intervention; he resolved them simply by drinking more water. As such, he was not harmed by the delay in seeing an advanced care provider because seeing a provider had no impact on the resolution of his condition. *See, e.g., Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015)

In light of the foregoing, no jury could reasonably conclude that APNP Fields' response to Green's condition violated the Eighth Amendment. She is therefore entitled to summary judgment.

**2. No jury could reasonably conclude that Nurse Taplin was deliberately indifferent to Green's symptoms.**

According to Green, Nurse Taplin showed deliberate indifference to his complaints of pain and cough by both failing to physically examine him and by ordering Green to stop taking Topiramate without regard to the dangers of abruptly stopping the medication. As an initial matter, Green and Nurse Taplin recall their interactions differently, but for purposes of summary judgment the disputes are not material. According to Green, Nurse Taplin asked him what he thought was causing his symptoms. Green asserts that he said he didn't know, and the only thing he was taking was Topiramate. Nurse Taplin entertained the idea that perhaps Green's symptoms were a side effect of the medication, and so he decided to rule that out (or in) by having Green pause the medication for three days to see if doing so had any impact. Green asserts that he recalls Nurse Taplin instructing him to stop taking the medication altogether. Regardless of their differences in recall, any misunderstanding about the plan was undisputedly cleared up a few days later when the health services manager clarified Nurse Taplin's plan in writing. Specifically, she advised

Green that Nurse Taplin was "trying to rule in or rule out a possible reason for [his] symptoms," and she instructed Green "to let [the health services unit] know in 3 days if [his] symptoms continue and/or have gotten better." Dkt. No. 35-1 at 49.

No jury could reasonably conclude that Nurse Taplin's efforts to identify the cause of Green's symptoms demonstrates deliberate indifference to those symptoms. As a layperson and without medical support, Green simply asserts that it can be dangerous to stop a medication cold turkey. On the other hand, Nurse Taplin, a trained medical professional, explains why there was no risk to Green. First, Topiramate is primarily an anti-seizure medication, and when the medication is prescribed for that purpose, there is a risk of seizures reoccurring once the medication is stopped. But that is not why Topiramate was prescribed to Green. Green was never at risk of seizure—on or off the medication. Next, Green was already inconsistently taking the medication. Green told Nurse Taplin he had not taken it that morning, and the nursing administration records showed spotty compliance. Nurse Taplin therefore believed that a three-day pause without tapering would not adversely impact Green but could help identify the cause of Green's symptoms. Green may have disagreed with Nurse Taplin's plan, but a disagreement between a prisoner and his medical provider is not sufficient by itself to establish an Eighth Amendment violation. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). In such cases, the Court defers to a medical provider's treatment decisions unless no minimally competent professional would have so responded under those circumstances. Green provides no evidence to support such a conclusion.

Green also makes much of the fact that Nurse Taplin failed to physically examine him or take his vitals, but he offers no evidence from which a jury could reasonably conclude he was harmed by this failure. It has long been held that, "[i]n order to succeed in a § 1983 suit, a plaintiff must establish not only that the state actor violated his constitutional rights, but also that the

11

violation *caused* the plaintiff injury or damages." *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011). Green offers no evidence to support a conclusion that taking his vitals would have resolved his symptoms or aided Nurse Taplin in determining the cause of Green's symptoms. As previously noted, it appears that Green was simply dehydrated from his own decision to limit his water intake and his symptoms resolved once he started drinking more water. Taking Green's pulse or listening to his breathing would not have revealed that Green was dehydrated, and Green was not harmed by Nurse Taplin's failure to do so. For these reasons, Nurse Taplin is entitled to summary judgment.

3. **No jury could reasonably conclude that Weinman was deliberately indifferent to Green's serious conditions.**

According to Green, Weinman failed to take appropriate steps to train his staff and/or remedy their alleged misconduct after being contacted by the institution complaint examiner who was investigating Green's inmate complaints. Weinman, who was the health services unit manager at the relevant time, had limited involvement. He provided no medical care to Green; he merely reviewed Green's records and provided information to the institution complaint examiner to assist with the investigation into Green's two inmate complaints. With regard to the first inmate complaint, Weinman confirmed there were no abnormalities in Green's most recent set of tests and noted that a follow-up appointment with a provider had been ordered. With regard to the second inmate complaint, Weinman again reviewed Green's records and explained that Green had met with Nurse Taplin, who had provided Green with education. Weinman also confirmed that Green had declined a follow-up appointment with a nurse because he wanted to see a provider. Dkt. No. 34 at ¶¶112-121; 128-135.

No jury could reasonably conclude that Weinman was deliberately indifferent to Green's serious medical condition. After being contacted by the institution complaint examiner, Weinman

12

investigated Green's complaints by reviewing Green's medical records. Weinman confirmed that appropriate testing had been completed, that Green had had several appointments with nurses, and that a follow-up appointment with a provider had been scheduled. He also confirmed that Green's test results were either normal or only slightly outside of the normal range, meaning there was no indication of a serious condition that required immediate attention. Given that Weinman was acting only in an administrative capacity and given that his investigation revealed no reason to suspect that Green's needs were being ignored or inadequately addressed, Weinman was entitled to defer to the judgment of Green's medical professionals. *See Eagen v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021). Weinman is therefore entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 32) is **GRANTED** and this action is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on May 14, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final.  Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment.  *See* Fed. R. App. P. 3, 4.  This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline.  *See* Fed. R. App. P. 4(a)(5)(A).  If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome.  If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court.  *See* Fed. R. App. P. 24(a)(1).  Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious.  *See* 28 U.S.C. §1915(g).  If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury.  *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b).  Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment.  Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment.  The Court cannot extend these deadlines.  *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.